1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JESUS ALEJANDRO PRIETO,

11          Petitioner,                    2:  10 - cv - 750 JAM TJB

12      vs.

13   JERREL ADAMS,

14          Respondent.           ORDER, FINDINGS AND

15                                RECOMMENDATIONS

16   _____/

17                        I.  INTRODUCTION

18          Petitioner, a state prisoner, is proceeding *pro se* with a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of murder and the attempted

20   murder of others along with various enhancements.  He was sentenced to life without the

21   possibility of parole for the murder, twenty-five years to life with the possibility of parole for a

22   gun use enhancement consecutive to twenty-eight years and four months for the attempted

23   murder convictions along with corresponding enhancements on those attempted murder

24   convictions.  Petitioner presents several claims in his federal habeas petition; specifically:  (1)

25   jury instructional error on aiding and abetting which created a conclusive presumption on the

26   prosecutor's burden of proof ("Claim I"); (2) prosecutorial misconduct when the prosecutor

                                        1

1    referred to a case as being from the California Supreme Court when in actuality it was from the

2    California Court of Appeal ("Claim II"); (3) prosecutorial misconduct when the prosecutor

3    provided "unsworn testimony" in the form of a videotape transcript that was not admitted into

4    evidence ("Claim III"); (4) prosecutorial misconduct when the prosecutor presented knowingly

5    false testimony ("Claim IV"); (5) ineffective assistance of counsel in making a concession during

6    closing argument ("Claim V"); (6) ineffective assistance of counsel in failing to object to the

7    prosecutor's characterization of the kill zone doctrine ("Claim VI"); (7) jury instructional error

8    on the kill zone doctrine ("Claim VII"); and (8) cumulative error ("Claim VIII").  For the

9    following reasons, the habeas petition should be denied.

10                                     II.  FACTUAL BACKGROUND[1]

11            In the early morning hours of March 6, 2004, two Norteno gang
             members were shot and killed while attempting to break into a
12           liquor store.  That night, their friends and associates held a
             candlelight memorial at the liquor store.  After the memorial, the
13           group gathered at a home on 45th Avenue.  About 15 to 50 people
             were standing around outside the house, talking, smoking, and
14           drinking.  Most of them were Nortenos.

15            A car drove by the house, and someone in the car started shooting.
             Donald Monroe suffered three gunshot wounds to the back and
16           died at the scene.  Sarah Donaldson was shot in the elbow.  Julie
             Gomez was shot in the leg and arm.  Jose Perez was hit in the
17           eyebrow.

18            A videotape someone took at the gathering was entered into
             evidence and played to the jury.  Two separate volleys of gunfire
19           can be heard on the tape.  There were at least 12 gunshots in all.
             Donaldson thought she saw two cars driving bumper to bumper
20           before she was shot, but she could not describe either car.  Gomez
             saw only one car before she was shot, but could not describe it.
21           Another person at the gathering, Shannon Perez, saw two cars and
             thought one of them was red.  Her husband, Jose Perez, saw a red
22           two-door hatchback that drove up to the house, stopped, and
             "unloaded."  He saw a second car after that, but could not describe
23           it.  Juan Reyes, who lived across the street saw a red hatchback
             drive up and start shooting.  He recognized the car as belonging to

24

25       _____

26            [1] The factual background is taken from the California Court of Appeal, Third Appellate
         District opinion from December 2008 which was attached by Respondent to his answer as
         Exhibit A (hereinafter the "Slip Op.").

someone named, "Juan."

Juan 'Chilango' Carreon owned a red Isuzu Impulse in March 2004. It was a two-door hatchback. On March 6, 2004, Carreon was hanging out with defendant Prieto and other Sureno gang members in a parking lot on 43rd Avenue when Prieto got a telephone call, then asked to borrow Carreon's car. Prieto told Carreon he needed the car to pick up his girlfriend. Prieto left in the car. Carreon waited around an hour and a half in the parking lot, before leaving on foot to go to his girlfriend's house on 44th Avenue. The next afternoon, he got his car back. One of the tires was flat, and everything was messed up on the inside. He called law enforcement because he was told the car had been involved in a shooting.

Forty-third Avenue was a hang out for Surenos. On March 6, 2004, Victor Gonzalez was also on 43rd Avenue with other Surenos. They were talking about Nortenos and Surenos. While they were there Jose "Tacca" Paredes shot up a car. [FN 3] The occupants of the car were Nortenos. Paredes fired about five or six shots at the car, then gave the gun to defendant Jose "Evelio" Gonzalez. After the shooting on 45th Avenue, defendant Gonzalez told Victor Gonzalez he shot Chapetes. Chapetes is a term for Nortenos.

> [FN 3] Paredes was charged for this crime, entered a plea, and was convicted of negligently discharging a firearm.

Two weapons of different calibers were involved in the 45th Avenue shooting. The shots that killed Monroe were from a 9 millimeter semiautomatic. All the 9 millimeter bullets recovered, including the bullets recovered from Monroe's body, were fired from the same weapon. Nine millimeter semiautomatic casings were found both at the scene on 45th Avenue and at 43rd Avenue. The 9 millimeter casing at the two locations were fired from the same weapon.

Detective Daniel Cabral interviewed defendant Prieto on March 12, 2004. Prieto's initial story was that he went home after he borrowed Carreon's car to go to his girlfriend's house. He originally denied any knowledge of the shootings at either 43rd or 45th Avenues. He also indicated he had been so intoxicated he did not remember much of anything. Although he initially denied knowing defendant Gonzalez, he eventually admitted he knew him and admitted he knew he was a Sureno.

Prieto admitted driving Carreon's red Isuzu Impulse to a location on 45th Avenue, where he knew Nortenos hung out. Defendant Gonzalez was in the front passenger seat, and Juan Borja was in the back seat. He saw people gathered in the street at 45th Avenue.

1    Someone in the car said, "There they are.  There they are."  He
     made a left-hand turn, and once he was near the crowd, defendant
2    Gonzalez fired a gun.  Prieto thought there had been approximately
     three shots fired in return, but never indicated he thought the
3    Nortenos had fired first.  Prieto at first told Detective Cabral that
     he was not sure if there was a gun in the car, but as they continued
4    to talk, he admitted he had seen a gun.

5    Detective Cabral conducted an interview of defendant Gonzalez on
     March 23, 2004.  Gonzalez admitted to Cabral that he had been on
6    43rd Avenue on the evening of March 6, 2004, and had seen the
     shooting there.  He also admitted being a passenger in Carreon's
7    red Isuzu with defendant Prieto.  He admitted being the shooter
     who fired at the house on 45th Avenue.  He fired the gun because
8    he was trying to scare the people, and because they had called him
     a derogatory term for Surenos as he drove by.  He never indicated
9    he shot the gun because the people on 45th Avenue were shooting
     at him.  He did, however, indicate he heard return fire after he
10   fired.

11   Detective Ron Aurich, an expert on Hispanic gangs, testified that
     in his opinion, Prieto was an active participant in a Surenos gang.
12   His opinion was based, in part, upon the fact that a Norteno shot
     off one of Prieto's fingers two years before the 45th Avenue
13   shooting.  Detective Aurich also testified that in his opinion
     Gonzalez was a member of the Surenos gang.

14

15   (Slip Op. at p. 3-7.)

16                         III.  PROCEDURAL HISTORY

17         After Petitioner was convicted and sentenced, he filed an appeal to the California Court

18   of Appeal.   Among the arguments that Petitioner raised in his direct appeal were the issues that

19   he raises in his federal habeas petition.  The California Court of Appeal affirmed the judgment in

20   December 2008.  The California Supreme Court summarily denied the petition for review in

21   March 2009.

22         In March 2010, Petitioner filed the instant federal habeas petition in the Southern District

23   of California.  The matter was subsequently transferred to the Eastern District.  Respondent

24   answered the federal habeas petition in September 2010.  Petitioner filed a traverse in December

25   2010.  In August 2011, this matter was transferred to the undersigned by Chief Judge Ishii.

26   //

                                        4

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.  See 28 U.S.C. 2254(d).

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly

1 established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

2 the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

3 applied, we may look for guidance to circuit precedents.").

4      The first step in applying AEDPA's standards is to "identify the state court decision that

5 is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

6 When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

7 last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

8 V.  ANALYSIS OF PETITIONER'S CLAIMS

9     A.  Claim I

10      In Claim I, Petitioner argues that the jury instructions on aiding and abetting created a

11 conclusive presumption that relieved the prosecution of its burden of proof.  The last reasoned

12 decision on this Claim was from the California Court of Appeal on direct appeal which stated the

13 following:

14         Prieto cites two instructions given, one regarding aiding and
abetting and one defining principals, and argues the use of the

15         words, "equally guilty" constituted a conclusive presumption that
violated his right of due process.  The first instruction stated, in

16         part that '[a] person is equally guilty of the crime whether he
committed it personally or aided and abetted the perpetrator who

17         committed it."  [FN 10]  The second instruction stated in part that,
"[e]ach principal, regardless of extent or manner of participation, is

18         equally guilty."  Prieto claims the jury may have understood this
language as "an irrebuttable direction to find aider and abettor

19         equally guilty as the personal perpetrator . . ."  He claims the
instructions violated his rights pursuant to In re Winship (1970)

20         397 U.S. 358, 364 [25 L.Ed.2d 368, 375], which held that the due
process clause of the Fourteenth Amendment protects the accused

21         from conviction except upon proof beyond a reasonable doubt of
every fact necessary to constitute the charged crime.

22

23           [FN 10]  The full instructions on aiding and abetting
were as follows:

24           "A person may be guilty of a crime in two ways;
One, he may have directly committed the crime,

25           two, he may have aided and abetted someone else
who committed the crime.

26           In these instructions I will call that other person the
perpetrator.  A person is equally guilty of the crime

whether he committed it personally or aided and
abetted the perpetrator who committed it.  Under
some specific circumstances, if the evidence
establishes aiding and abetting of one crime, a
person may also be found guilty of other crimes that
occurred during the commission of the first crime.
To prove that the defendant is guilty of a crime
based on aiding and abetting that crime, the People
must prove that:  One, the perpetrator committed the
crime; two, the defendant knew that the perpetrator
intended to commit the crime; three, before or
during the commission of the crime, the defendant
intended to aid and abet the perpetrator in
committing the crime; and four, the defendant's
words or conduct did, in fact, aid and abet the
perpetrator's commission of the crime.
Someone aids and abets a crime if he knows of the
perpetrator's unlawful purpose and he specifically
intends to, and does, in fact, aid, facilitate, promote,
encourage, or instigate the perpetrator's commission
of that crime.  If all of these requirements are
proved, the defendant does not need to actually have
been present when the crime was committed to be
guilty as an aider and abettor.
If you conclude that the defendant was present at the
scene of the accident or failed to prevent the crime,
you may consider that fact in determining whether
the defendant was an aider and abettor; however,
the fact that a person is present at the scene of a
crime or fails to prevent the crime does not by itself
make him an aider and abettor."

Prieto does not make clear precisely what facts he claims were not
found true by the jury because the court directed it to presume such
facts to be true.  The federal appeals court cases he cites, i.e.,
Flowers v. Blackburn (5th Cir. 1986) 779 F.2d 1115, 1121;
Robertson v. Cain (5th Cir. 2003) 324 F.3d 297, 303-304; and
Laird v. Horn (3d Cir. 2005) 414 F.3d 419, 427, all relate to the
intent to kill.  Flowers v. Blackburn, supra, found the instructions
given deficient because they allowed the jury to convict the
defendant of first degree murder if *either* he or the perpetrator had
the requisite intent to kill.  (779 F.[2]d at p. 1121.)  Robertson v.
Cain, supra, likewise held the instructions given relieved the state
of the burden of proving the specific intent to kill.  (324 F.3d at p.
303.)  Also in Laird v. Horn, supra, the instructions failed to
inform the jury that it must find the accomplice intended to kill the
victim in order to return a first degree murder conviction.  (414
F.3d at p. 427.)

The instructions given in this case could not reasonably have been
interpreted to relieve the jury of finding the requisite mental state

7

for a murder conviction.  The jury was instructions that the guilt of an aider and abettor was equal to that of a perpetrator.  This is a correct statement of the law.  (<u>People v. Prettyman</u>, supra, 14 Cal.4th at p. 259.)  However, the jury was also instructed that defendant could not be an aider and abettor unless he knew the perpetrator intended to commit the crime, and he intended to aid and abet the perpetrator in the commission of that crime.  The jury was told that an aider and abettor must be one who "specifically intends to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

These instructions taken as a whole correctly instructed the jury that it was required to find the requisite intent for a murder conviction.

(Slip Op. at p. 40-43.)

A challenge to a jury instruction solely as an error of state law does not state a claim cognizable in a federal habeas corpus action.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  <u>See</u> <u>id.</u> at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  <u>See</u> <u>id.</u>  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  <u>See</u> <u>United States v. Frady</u>, 456 U.S 152, 169 (1982). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or influence in determining the jury's verdict.  <u>See, e.g.</u>, <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 61-62 (2008) (per curiam).

Petitioner asserts that "the aider and abettor instructions of 'is equally guilty' as the perpetrator is a conclusive presumption that relieved the prosecution's burden of proof."  (Pet'r's Pet. at p. 6.)  Petitioner is not entitled to federal habeas relief on this Claim for the following

8

1   reasons.  The jury was specifically instructed that they could not convict the Petitioner unless his

2   guilt was proven by the People beyond a reasonable doubt.  (See Reporter's Tr. at p. 1619, 1627).

3   The jury was then instructed that a person is equally guilty of a crime whether he committed it

4   personally or aided and abetted it.  The trial court then immediately explained to the jury that to

5   prove that the Petitioner is guilty of a crime based on aiding and abetting, the prosecutor had to

6   prove that, "One, the perpetrator committed the crime; two, the defendant knew that the

7   perpetrator intended to commit the crime; three, before or during the commission of the crime,

8   the defendant intended to aid and abet the perpetrator in committing the crime; and four, the

9   defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the

10  crime."  (Id. at p. 1629.)

11        Petitioner fails to show any ambiguity or inconsistency in the jury instructions on aiding

12  and abetting.  See Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009) ("the defendant must

13  show both that the instruction was ambiguous and that there was a 'reasonable likelihood' that

14  the jury applied the instruction in a way that relieved the State of its burden of proving every

15  element of the crime beyond a reasonable doubt") (citations omitted).  As described above, the

16  jury was specifically instructed that the prosecution had to prove beyond a reasonable doubt the

17  requisite elements of aiding and abetting.  Petitioner failed to show that the California Court of

18  Appeal's decision constituted an unreasonable application of clearly established federal law

19  and/or that it resulted in a decision based on an unreasonable determination of the facts.  The

20  California Court of Appeal reviewed the instructions as a whole rather than in artificial isolation.

21  See Estelle, 502 U.S. at 72.  Claim I should be denied.

22        B.  Claim II

23        In Claim II, Petitioner argues that the prosecutor committed misconduct during his

24  closing argument when he improperly referred to a case as decided by the California Supreme

25  Court when in actuality it was decided by the California Court of Appeal.  More specifically,

26  Petitioner asserts that the prosecutor "falsely elevated a Court of Appeal opinion to Authoritative

California Supreme Court status." (Pet.'r's Pet. at p. 7.) Petitioner also argues that his trial counsel was ineffective for failing to object during the prosecutor's closing argument. The last reasoned decision on this Claim was from the California Court of Appeal on direct appeal which stated the following:

> During closing argument, the prosecutor discussed foreseeability and argued that shootings were a natural and probable consequence of gang confrontations. He argued that Prieto would try to say he had not intended to kill anyone, and that he thought Gonzalez would shoot into the air or shoot to scare people. The prosecutor argued that if killing someone was a foreseeable or likely consequence of firing a gun, the law would hold an aider and abettor accountable under the theory of natural and probable consequences. Then, quoting extensively from People v. Montes (1999) 74 Cal.App.4th 1050 (Montes), he made the following argument:

>> "I want to read to you a small portion of a case. This fact pattern doesn't apply in our case, but I want you to see how the law treats the idea of natural and probable consequences. And this is based on a fact situation that is somewhat similar, but not quite. What happens in this situation is a bunch of gang members that get together and they decide to go into a rival's turf to commit an actual fight – to commit a fight. And at the end of that fight someone ends up dead. And this person – this defendant was convicted of that homicide. And the Supreme Court of California says, under this day and age of gangs, that's foreseeable.

>> And here is the word of the Supreme Court. They first address a case called Butts. Butts is a case that occurred decades ago that said originally that you can't apply this theory. But this is the Supreme Court's comment on the foreseeability with regards to gangs. It says, 'Butts is also more than three decades old and represents a different social [era], when streetfighters commonly relied on fists alone to settle disputes.' That's the olden days. It would just be fights, no guns, no knives. 'Unfortunately, as this case illustrates' in reference to the Montez [sic] case, 'the nature of modern gang warfare is quite different. When rival gangs clash today verbal talking quickly give way to physical violence and gunfire. No one immersed in gang culture is [un]aware of this reality. And we see no reason the Courts should turn a blind eye to this. Given the

great potential for escalating violence during gang
confrontation it is immaterial whether one gang
member specifically knew another gang member
had a gun.'

The words of our Supreme Court.  In that case it
was the same idea.  The defense will say, I didn't
know he had a gun.  We were just going there to
fight.  The Supreme Court said in that same
situation things have changed, ladies and gentlemen.

Prieto argues the prosecutor misstated the law and committed
misconduct in four respects.  First, Montes was not a Supreme
court case.  Second, as a court of appeal opinion, Montes, could
not disapprove People v. Butts (1965) 236 Cal.App.2d 817, which
was another court of appeal opinion.  Third, People v. Prettyman
(1996) 14 Cal.4th 248, 267, a Supreme Court case, actually cited
Butts with approval.  Fourth, the trial court denied the prosecutor's
request to instruct the jury on disturbing the peace as a target
offense.

Prieto did not object to the prosecutor's argument.  Failure to
object forfeits the claim of misconduct unless the objection and/or
the request for an admonition would have been futile, or the
admonition would have been insufficient to cure the harm
occasioned by the misconduct.  (People v. Panah (2005) 35 Cal.4th
395, 462.)  A claim that one of these exceptions applies must be
supported by the record, and the defendant's "ritual incantation that
an exception applies is not enough."  (Ibid.)

Any misconduct by the prosecutor in incorrectly advising the jury
that the authority cited was Supreme Court authority rather than
court of appeal authority, or in incorrectly stating the law could
have been cured by a timely objection and admonition.  Moreover,
it is doubtful that lay jurors would have understood the significance
that the case cited as authority was decided by the Supreme Court
rather than a court of appeal, and the prosecutor never told the jury
that Montes had overruled Butts.

Prieto claims his trial counsel was ineffective for not raising a
timely objection.  "A defendant claiming ineffective representation
bears the burden of proving by a preponderance of the evidence
both (1) that counsel's performance was deficient, i.e., that the
representation fell below an objective standard of reasonableness,
and (2) that there is a reasonable probability that, but for counsel's
unprofessional errors, the result would have been more favorable to
defendant, i.e., a probability sufficient to undermine confidence in
the outcome."  (In re Ross (1995) 10 Cal.4th 184, 201.)  "In order
to prevail on (an ineffective assistance of counsel) claim on direct
appeal, the record must affirmatively disclose the lack of a rational
tactical purpose for the challenged act or

11

omission. [Citations.]" (<u>People v. Ray</u> (1996) 13 Cal.4th 313, 349.) "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citation.]" (<u>People v. Huggins</u> (2006) 38 Cal.4th 175, 206.) Since this record is silent as to the reason defense counsel failed to object to the prosecutor's argument, we must reject defendant's claim of ineffective assistance of unless there could be no satisfactory explanation.

The failure to object to the admission of evidence, or in this case to move to strike evidence, is a tactical decision that will seldom establish incompetence of counsel. (<u>People v. Huggins</u>, <u>supra</u>, 38 Cal.4th at p. 206.) This was not a case in which there could be no satisfactory explanation for failing to object. In this case, defense counsel elected to directly address the prosecutor's remarks himself.

Defense counsel addressed the prosecutor's analysis of <u>Montes</u> as soon as he began his closing argument:

> "I've got to mention one thing before I get into my presentation. And that is, what the District Attorney was reading a short time ago at the end of his argument. He read you a case of our Supreme Court. I'd like to point out to you that that case means nothing in this court. What you're going to hear about the law that you consider in looking at the facts that will be given to you but His Honor. And that's all I'm going to ask[,] to completely disregard what you heard about that case. We don't know the circumstances of it. All that you heard was one short paragraph from the holding."

Later, the trial court instructed, "[i]f you believe the attorneys' [ ] comments on the law conflict with my instructions, you must follow my instructions." The trial court then instructed the jury on the theory of natural and probable consequences.

As a matter of trial tactics, defense counsel may well have believed rather than confuse the jury with the intricacies and hierarchy of judicial authority, he would tell the jury to disregard the prosecutor's statement of the law, and rely on the court's instruction regarding the law. We do not find on this record that counsel's performance was deficient.

(Slip Op. 28-32.)

Respondent argues that Petitioner's prosecutorial misconduct argument within Claim II is

12

procedural barred.  Under these circumstances however, the merits of Petitioner's prosecutorial

argument within Claim II will be analyzed.  See Lambrix v. Singletary, 520 U.S. 518, 525 (1997)

(explaining that a district court may address the merits without reaching procedural issues where

the interests of judicial economy are best served by doing so); cf. Franklin v. Johnson, 290 F.3d

1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the

merits issues presented by the appeal, so it may well make sense in some instances to proceed to

the merits if the result will be the same.")

       A criminal defendant's due process rights are violated if prosecutorial misconduct renders

a trial "fundamentally unfair."  Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing

Darden v. Wainright, 477 U.S. 168, 183 (1986)).  A habeas petition will be granted for

prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to

make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181 (internal

quotation marks and citation omitted).  Isolated comments by a prosecutor may be cured by jury

instructions.  See Sassounian v. Roe, 230 F.3d 1097, 1106-07 (9th Cir. 2000); see also Hall v.

Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) ("Put in proper context, the comments were

isolated moments in a three day trial.")  A claim of prosecutorial misconduct is analyzed under

the prejudice standard set forth in Brecht, 507 U.S. 619.  See Karis v. Calderon, 283 F.3d 1117,

1128 (9th Cir. 2002) (stating that a claim of prosecutorial misconduct is analyzed under the

standard set forth in Brecht).  Specifically, the inquiry is whether the prosecutorial misconduct

had a substantial and injurious effect on the jury's verdict.  See Johnson v. Sublett, 63 F.3d 926,

930 (9th Cir. 1995) (finding no prejudice from prosecutorial misconduct because it could not

have had a substantial impact on the verdict under Brecht).

       In this case, Petitioner fails to show that the prosecutor's improper statement that Montes

was a California Supreme Court case instead if a California Court of Appeal case had a

substantial and injurious effect on the jury's verdict.  The jury was specifically instructed by the

trial judge that, "if you believe that the attorney's comments on the law conflict with my

13

instructions, you must follow my instructions." (Reporter's Tr. at p. 1617.)  Furthermore, the

jury was instructed that "[n]othing that the attorneys say is evidence," and that "[i]n deciding

whether the People have proved their case beyond a reasonable doubt, you must impartially

compare and consider all the evidence that was received throughout the entire trial." (Id. at p.

1619.)  The jury is deemed to have followed these instructions.  See Weeks v. Angelone, 528

U.S. 225, 234 (2000).  The fact that the prosecutor misspoke during his closing argument that a

case was a California Supreme Court case when in actuality it was a California Court of Appeal

case did not have a substantial and injurious effect on the jury's verdict.[2]

Within Claim II, Petitioner also argues that his trial counsel was ineffective for failing to

object to the prosecutor's mischaracterization of Montes as a California Supreme Court case.

The Sixth Amendment guarantees effective assistance of counsel.  In Strickland v. Washington,

466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective

assistance of counsel.  First, the petitioner must show that considering all the circumstances,

counsel's performance fell below an objective standard of reasonableness.  See id. at 688.

Petitioner must identify the acts or omissions that are alleged not to have been the result of

reasonable professional judgment.  See id. at 690.  The federal court must then determine

whether in light of all the circumstances, the identified acts or omissions were outside the range

of professional competent assistance.  See id.

_____

[2] Petitioner's federal petition appears to only raise the issue concerning the prosecutor's
misquote regarding whether the case he cited was a California Supreme Court as opposed to a
California Court of Appeal decision.  Petitioner raised several other issues concerning the
prosecutor's purported misstatement of the law as outlined in the California Court of Appeal
decision, including that Montes did not disapprove of Butts since one Court of Appeal decision
cannot disapprove of another and that Prettyman cited Butts with approval.  To the extent that
Petitioner's federal habeas petition could be liberally construed as including these additional
arguments, they too would fail to merit granting federal habeas relief for similar reasons as to
why Petitioner's prosecutorial misconduct argument described within this Claim fails.
Additionally, to the extent that Petitioner federal petition includes the argument he raised in the
state courts that the prosecutor committed misconduct for requesting the court instruct the jury on
disturbing the peace as a target offense, it too is without merit.  Petitioner failed to show that
such a request had a substantial or injurious effect on the jury's verdict as the trial court denied
the prosecutor's request.  (See Reporter's Tr. at p. 1491.)

14

1    Second, a petitioner must affirmatively prove prejudice.  See id. at 693.  Prejudice is

2    found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

3    result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

4    probability sufficient to undermine the confidence in the outcome."  Id.  A reviewing court "need

5    not determine whether counsel's performance was deficient before examining the prejudice

6    suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

7    ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

8    followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

9    697).

10    In this case, it is easier to resolve Petitioner's ineffective assistance of counsel claim

11    within Claim II under the prejudice prong.  For similar reasons described above, Petitioner failed

12    to show to a reasonable probability that the outcome of the proceeding would have been different

13    had counsel objected to the prosecutor's mischaracterization of Motes as a California Supreme

14    Court opinion.  The jury was specifically instructed that it was to base its verdict on the evidence

15    and that nothing that the attorneys said was evidence.  Furthermore, the jury was specifically

16    instructed that the trial judge's statement of the law controlled if there was a conflict with the

17    attorneys' comments on the law.  Thus, under these circumstances, Petitioner failed to show the

18    requisite Strickland prejudice.[3]

19    C.  Claim III

20    In Claim III, Petitioner argues that the prosecutor committed misconduct by providing

21    unsworn testimony not in evidence.  Specifically, Petitioner argues that the prosecutor

22    improperly referred to the transcript of an interview of the Petitioner by a detective.  The

23    prosecutor's argument contained a statement that Petitioner knew that the co-defendant had a gun

24

25    _____

26    [3] Similar reasons would dictate denying federal habeas relief to the extent that Petitioner
argues that counsel was ineffective for the other three arguments he raised in state court within
his argument.  See supra note 2.

15

in the car.  The last reasoned decision on this Claim was from the California Court of Appeal on

direct appeal which stated the following:

> Detective Cabral conducted an interview with Prieto during the investigation of the crimes, during which Prieto made several admissions.  The videotape of the interview, which was conducted in Spanish, was admitted into evidence, but the English transcript was not.

> Detective Cabral testified to Prieto's statements during the interview.  On cross-examination, he testified that Prieto was aware that there was a gun in the vehicle he was driving.  Defense counsel reminded Cabral that at the preliminary hearing, he had said Prieto did not know anyone had a gun.  Defense counsel finally got Cabral to agree that Prieto consistently denied knowing a gun was going to be fired from the car he was driving.
> On redirect, the prosecutor played a portion of the videotape of Prieto's interview for Cabral, after which he asked Cabral, "[d]uring the interview did he [Prieto] indicate to you, during the interview itself, that he knew there was a gun in the car or not?" Cabral responded, "[h]e indicated to me that he was not sure at first.  And then as we continued to talk, he said, yes, he had seen a gun before."  There was no further cross-examination on this subject.

> The prosecutor argued as follows in closing:

>> ". . . I want you to understand the context of the questions asked by Mr. Thommen [Prieto's counsel] to Detective Cabral, because there was a portion of . . . Detective Cabral's testimony where he says, "Look, the defendant told me he knew the gun was in the car.'

>> Mr. Thommen asked him about his prelim testimony. . . . Didn't you say he didn't know the gun was in the car?  Detective Cabral said it was a mistake.  But remember, he said after that, we asked him, after having the opportunity to review this tape, to review the material and before you testified, did he tell you he knew the gun was in the car when the defendant had a gun – Defendant Evelio.  And he said, yes.

>> Understand this, because then Mr. Thommen, at that point because – remember there was a transcript on this.  You won't be able to see the transcript, unfortunately.  But there was a transcript on this and it's all done in English.  You saw it.  Mr. Holmes referred to it, Mr. Thommen referred to a transcript

16

of the actual interview itself.  And if there was any questions – because remember it was recorded – in regards to what was said during the interview you would best believe Detective Cabral [sic] would have asked about that.  But you heard no question from Mr. Thommen coming up saying, 'Well, let's go back to the interview itself.  Maybe you made a mistake during the prelim when you said no.  Show me where in the transcript it says that.'  He couldn't ask that because it was there.  It was on videotape.  The defendant said, 'I knew he had a gun.'

So all he could do to question Detective Cabral was to the mistake that he made at the prelim.  Nothing to do with whether or not it was in the videotape or not, because he had the transcript he could have asked him about and he didn't.  But ultimately remember, it doesn't matter.  But he knew the gun was in the car."

Defense counsel did not object to the prosecutor's argument.  Defendant argues the prosecutor's statements amounted to unsworn testimony about the contents of the transcript of Prieto's interview and was violative of his Sixth Amendment rights to confrontation and cross-examination.

For reasons already stated, defendant's failure to object to the prosecutor's argument forfeited the issue on appeal.  In any event, we reject defendant's characterization of the prosecutor's statement as giving unsworn testimony.  The prosecutor was not purporting to tell the jury what was in the transcript.  Instead, he was arguing that if, in fact, Prieto had not admitted to Cabral that he knew about the gun, Prieto's trial counsel would have impeached Cabral's testimony with Prieto's own statement, which was on videotape.  The jury could infer from this fact that Prieto had, as Cabral testified, known about the gun, and that any statement Cabral made otherwise during the preliminary examination was simply a mistake.  The prosecutor was not asserting a fact not admitted into evidence, or implying that he knew facts that were not in evidence.  Accordingly, there was no misconduct.

(Slip Op. at p. 32-35.)

Similar to Claim II, Respondent argues that Claim III is procedurally barred.  However, the merits of Claim III will be analyzed.  See Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232.

With respect to improper prosecutorial comments during a closing argument, the law is

1   settled that under this due process standard, "[c]ounsel are given latitude in the presentation of

2   their closing arguments, and the courts must allow the prosecution to strike hard blows based on

3   the evidence presented and all reasonable inferences therefrom." Ceja v. Stewart, 97 F.3d 1246,

4   1253-54 (9th Cir. 1996) (internal quotation marks omitted).  A reviewing court should consider a

5   prosecutor's allegedly improper statements in light of the realistic nature of trial closing

6   arguments.  "Because 'improvisation frequently results in syntax left imperfect and meaning less

7   than crystal clear,' 'a court should not lightly infer that a prosecutor intends an ambiguous

8   remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation,

9   will draw that meaning from the plethora of less damaging interpretations.'" Williams v. Borg,

10  139 F.3d 737, 744 (9th Cir. 1998) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647

11  (1974)).  A challenged or offering statement must also be evaluated in the context of the entire

12  trial, as well as the context in which it was made.  See Boyde v. California, 494 U.S. 370, 384-85

13  (1990).

14       For the reasons stated by the California Court of Appeal, the prosecutor's statement

15  during his closing argument did not constitute testifying to "unsworn testimony."  Rather, the

16  prosecutor's statement was a permissible inference based on the testimony at trial.  On redirect,

17  Detective Cabral testified that during his interview with Petitioner that at first he indicated that

18  he was not sure that there was a gun in the vehicle but as they "continued to talk, he said, yes, he

19  had seen a gun before."  (Reporter's Tr. at p. 1035.)  The prosecutor's statement outlined above

20  was a reasonable inference therefore from the testimony of Detective Cabral and did not amount

21  to prosecutorial misconduct.

22       Furthermore, Petitioner failed to show that the statement had a substantial and injurious

23  effect on the jury's verdict.  The jury was specifically instructed that, "[n]othing that the

24  attorneys say is evidence.  In their opening statements and closing argument, the attorneys

25  discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only

26  witnesses' answers are evidence."  (Reporter's Tr. at p. 1619.)  The jury is deemed to have

18

followed this instruction, see Weeks, 528 U.S. at 234, and as outlined above, there was testimony

from Detective Cabral that Petitioner told him during the interview that he had seen the gun

before in the car.  Thus, for the foregoing reasons, Petitioner is not entitled to federal habeas

relief on Claim III.

IV.  Claim IV

In Claim IV, Petitioner argues that the prosecutor presented knowingly false testimony in

the form of Petitioner's purported statement to Cabral during the interview that he had

knowledge of the gun in the vehicle.  The last reasoned decision on this Claim was from the

California Court of Appeal which stated the following:

> Prieto argues the prosecutor presented, or failed to correct, the false
> testimony of Cabral, and that this was a violation of the right to due
> process.  The argument is directed to Cabral's testimony on
> redirect examination.  On cross-examination, defense counsel
> elicited an affirmative response from Cabral in answer to the
> question, did Prieto "consistently den[y] knowing that any gun was
> going to be fired from the car he was driving . . . until it actually
> happened?"
>
> On redirect examination, the prosecutor played a portion of the
> videotaped interview for Cabral, and elicited from Cabral that he
> had reviewed the videotape prior to testifying and had read the
> transcript of the interview.  The prosecutor then asked:  "During
> the interview did he [Prieto] indicate to you, during the interview
> itself, that he knew there was a gun in the car or not?"  Cabral
> answered:  "He indicated to me that he was not sure at first.  And
> then as we continued to talk, he said, yes, he had seen a gun
> before."  In fact, neither of Cabral's statements, i.e., that Prieto
> consistently denied knowing anyone in the car had a gun, or that
> Prieto said he had seen a gun before, was completely accurate.
> Prieto at first maintained he did not know about the gun.  [FN
> 9] He then said he was "not sure."  Finally, when asked whether
> he thought Gonzalez had a gun, he admitted, "Maybe yes.  I think
> that maybe yes."
>
> > [FN 9]  Even though we granted Prieto's application
> > to augment the record with the transcript of his
> > interview with Cabral, including the English
> > translation, we have serious doubts as to Prieto's
> > ability to rely on the transcript on appeal.  The
> > transcript was not admitted into evidence, and was
> > not made available to the jury, which saw only the
> > videotape of the interview conducted in Spanish.  In

19

Prieto's request to this court to augment the record, he cited <u>People v. Gaston</u> (1978) 20 Cal.3d 476, which stated that a party desiring to augment the record on appeal to include matters outside the "normal" record need only show that the matters may be useful on appeal.  (<u>Id.</u> at p. 482.)  However, <u>Gaston</u> indicated the "normal" record excluded the transcript of the jury voir dire, opening statements, and closing arguments of counsel.  (<u>Ibid.</u>)  Gaston sought to augment the record to include a transcript of counsels' closing argument and a transcript of the tape recording that was played to the jury, but by stipulation was not stenographically recorded.  (<u>Id.</u> at p. 480.)  Thus, Gaston sought to include in the appellate record matters that were actually heard by the jury.  Here, the English version of the videotape was never heard by the jury, thus was never part of the record of this trial.  Nevertheless, the People did not object to the augmentation of the record on appeal and do not argue that we should ignore the transcript.  We therefore consider the transcript in our determination of the issues raised.

"[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict . . . ."  (<u>United States v. Bagley</u> (1985) 473 U.S. 667, 680, fn. 9 [87 L.Ed.2d 481, 493].)  However, Cabral's testimony was not actually false.  Instead, Cabral made Prieto's statement about the gun seem more unequivocal than the translation indicates it was.  Cabral said that Prieto indicated he knew about the gun in the car, when in fact Prieto said he "thought" that "maybe" there was a gun.

Cabral was testifying to his understanding of Prieto's admission.  It is understandable given the facts of the case that Cabral would have interpreted this hesitant admission as a more definite admission.  As Cabral testified, individuals who are responsible for a crime "have a tendency of minimizing things."  He also testified in regard to a question about Gonzalez's statement that one cannot understand the transcribed version of the statement without actually viewing the person.  Body motions sometimes translate something different.

Prieto started out saying he definitely was unaware anyone in the car had a gun, then said he was not sure, and finally admitted he may have known.  In this case, where several gang members decided to drive by a location known as a hang out for a rival gang shortly after a prior confrontation that included gunfire, it strains credulity to believe that Prieto did not know or suspect that one of his cohorts was armed before going into enemy territory.  Prieto's qualified admission was enough to indicate that he did, in fact,

1      know Gonzalez was armed.

2      Cabral was justified in assuming that under the circumstances, if
       Prieto had not known anything about a gun, he never would have
3      admitted he "thought" that "maybe" there was a gun.  Additionally,
       Cabral was in a better position to judge, from Prieto's demeanor
4      and inflection, whether this qualified admission was in fact an
       unqualified admission or knowledge.  Because Cabral's testimony
5      was not false, or even substantially misleading, we find no
       misconduct.

6

7      (Slip Op. at p. 37-40.)

8             The prosecutor's knowing use of false or perjured testimony violates a criminal

9      defendant's due process rights.  See Napue v. Illinois, 360 U.S. 264, 269 (1959); see also United

10     States v. Bagley, 473 U.S. 667, 680 n. 9 (1985) ("a conviction obtained by the knowing use of

11     perjured testimony must be set aside if there is any reasonable likelihood that the false testimony

12     could have affected the jury's verdict"); Morales v. Woodford, 388 F.3d 1159, 1179 (9th Cir.

13     2004) ("The due process requirement voids a conviction where the false evidence is known to be

14     such by representatives of the State.") (internal quotation marks and citation omitted).  "The

15     same result obtains when the State, although not soliciting the false evidence, allows it to go

16     uncorrected when it appears."  See Napue, 360 U.S. at 269.  However, mere inconsistencies in

17     the evidence do not constitute the knowing use of perjured testimony by the prosecutor.  See

18     United States v. Geston, 299 F.3d 1130, 1135 (9th Cir. 2002).  Rather, it is within the province of

19     the jury to resolve the disputed testimony.  See id.  A factual basis for attributing knowledge to

20     the government that the testimony was perjured must be established.  See Morales, 388 F.3d at

21     1179 (rejecting a due process violation claim where petitioner "sets out no factual basis for

22     attributing any misconduct, any knowing presentation of perjury, by the government").  Thus, to

23     prevail on a false evidence claim, "the petitioner must show that (1) the testimony (or evidence)

24     was actually false, (2) the prosecution knew or should have known that the testimony [or

25     evidence] was actually false, and (3) that the false testimony [or evidence] was material."  See

26     Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010), cert. denied, 131 S.Ct. 2093 (2011).

1    Petitioner fails to show that he is entitled to federal habeas relief on this Claim as he fails

2  to show that the testimony of Cabral was "actually false."  As noted by the California Court of

3  Appeal, during the interview, Petitioner initially denied knowing that there was a gun in the

4  vehicle.  However, as the interview continued, Petitioner's response wavered and he eventually

5  told the police that he thought that "maybe yes," meaning that he thought someone in the car had

6  a gun.  Detective Cabral testified at trial that:

7         In a nutshell, basically when we interview individuals that are
          responsible for a crime, they have a tendency of minimizing things.
8         And once you start letting them know that you do know what
          happened or have bits and pieces, then they start saying, "Okay.
9         Well, I'm not going to lie anymore," and they'll end up coming up
          with portions or the whole truth.

10

11 (Reporter's Tr. at p. 1004-05.)  Under these circumstances, in light of the evolution that takes

12 place during an interrogation along with Petitioner's changing statements to Cabral during the

13 interview, Petitioner fails to show that the testimony of Cabral was false.  Therefore, he cannot

14 show that the prosecutor committed misconduct on this issue.  Accordingly, Claim IV should be

15 denied.

16    E.  Claim V

17    In Claim V, Petitioner argues that his trial counsel was ineffective by making a

18 concession during his closing argument.  The last reasoned decision on this Claim was from the

19 California Court of Appeal on direct appeal which stated the following:

20         Prieto argues his trial counsel's comments in closing argument
          constituted a concession of guilt, and rendered his assistance of
21         counsel ineffective.  However, trial counsel's argument did not
          amount to a concession of guilt.
22
          Prieto's counsel stated:
23
          "Now, they'll go on in that instruction to tell you
24         that someone aids and abets a crime if he or she
          knows of a perpetrator's unlawful purpose and he or
25         she specifically intends to and does, in fact, aid,
          facilitate, promote, encourage or instigate the
26         perpetrator's commission of that crime.  That's a

22

1

> mouthful.  And that's a lot that you'd be looking
> for.

2

> Jesus, if he got by the first hurdle, that somehow he
> knew there was going to be a gun fired out the
> window, what did he do to assist him?  He didn't do
> anything to assist him.  As soon as he heard the gun
> being fired he hit the accelerator and he took off
> down the street as fast as he could.

3

4

5

6

> But our position is that he didn't even know.  He
> was questioned extensively by Officer Cabral.  And
> I think the officer said three or four times he said
> that he didn't know there was a gun in there.  He
> knew about somebody having a gun on 43rd Street,
> but he didn't know about a gun on 45th Street."

7

8

9

Later defense counsel argued:

10

11

> "That sums up pretty much the way I see the
> evidence.  You really only have one decision to
> make.  What did my client know at the time the
> shooting went down?  If he knew that Gonzalez was
> going to use it to shoot at Nortenos, then you have
> to convict him.  But there's no evidence to show he
> did know it.  You would have to speculate to find
> that he knew there was a gun in that car and that it
> was going to be used."

12

13

14

15

It is true that unless the client consents, and lacking any reasonable
tactical reason, counsel cannot argue to the jury that the client is
guilty.  (<u>People v. Gurule</u> (2002) 28 Cal.4th 557, 612; <u>People v.
Diggs</u> (1986) 177 Cal.App.3d 958, 970.)  But in this case,
counsel's argument was neither a concession of guilt, nor
unreasonable.

16

17

18

19

Counsel did not claim that Prieto was guilty.  He told the jury
Prieto was guilty only if it found he knew Gonzales [sic] had a gun
and knew that he intended to use it to shoot at Nortenos.  Counsel
then forcefully argued that Prieto did not have knowledge of the
gun or Gonzalez's intent.  Furthermore, it would have been
unreasonable for counsel to argue that Prieto was not guilty even if
he knew of the gun, and knew that Gonzalez intended to use it
against the Nortenos because he did not actually aid and abet the
commission of the crime.  Such an argument would have resulted
in counsel's loss of all credibility with the jury.

20

21

22

23

24

Accordingly, there was no ineffective assistance of counsel.

25

26

(Slip Op. at p. 43-45.)

1    Petitioner failed to show that the California Court of Appeal's decision resulted in a

2    decision that was contrary to, or involved an unreasonable application of, clearly established

3    federal law, as determined by the Supreme Court of the United States or resulted in a decision

4    that was based on an unreasonable determination of the facts in light of the evidence presented.

5    Petitioner's ineffective assistance of counsel claim fails to overcome the strong presumption that

6    counsel's performance reflected sound trial strategy and did not fall below an objective standard

7    of reasonableness.  See Strickland, 466 U.S. at 689.  Contrary to Petitioner's assertions, trial

8    counsel did not concede Petitioner's guilt during his summation as the above quoted language

9    cited by the California Court of Appeal indicates.  Thus, Petitioner's argument that counsel was

10   ineffective in conceding his guilt should be rejected and Claim V should be denied.

11       F.  Claim VI

12       In Claim VI, Petitioner argues that his trial counsel was ineffective for failing to object to

13   the prosecutor's misstatements with respect to the kill zone doctrine.  The California Court of

14   Appeal provided the last reasoned decision on this Claim and stated the following:

15           Defendants claim the prosecutor committed misconduct when he
             argued the kill zone theory to the jury.  No timely objection to the
16           argument was made, thus forfeiting the argument on appeal.
             (People v. Farnum, (2002) 28 Cal.4th 107, 167.)  In any event there
17           was no misconduct.

18           The argument defendants challenge occurred when the prosecutor
             was attempting to explain the concept of the kill zone.  The
19           prosecutor argued separately to each jury.  To the Gonzalez jury, he
             argued:
20
21               "I want to talk about Counts Two, Three and Four,
                 [attempted murder] quickly.  Under the law, the law
22               doesn't require that we prove that the defendant
                 intended to kill Sarah Donaldson herself or Julia
23               Gomez herself or anyone else in that crowd for that
                 matter.  What the law says is when you create an
24               atmosphere – or as the law puts it – a kill zone,
                 when you fire eleven shots from a semiautomatic 9
25               mm pistol into a crowd, you created a kill zone, a
                 zone formed for everybody in it.  And he can be
26               found guilty for attempted murder of everyone in
                 that kill zone.  That is why you have Sarah

24

Donaldson pled as a victim of attempted murder. That is why you have Julia Gomez pled as a victim of attempted murder.

You will finally get a count for a person named John Doe, a person with no name.  You can put whatever name you want in there.  You can look at that video.  Put the person with the red hat, the person in the white T-shirt, in the black T-shirt.  Every one of those people that are in that driveway is represented by Count Four:  John Doe.  You don't need a name.  You have a face.  You have a person.  There were about twenty kids out there that day.  Everyone of them fits in that court because they were all in the zone marked"

Later, in arguing to the Prieto jury, the prosecutor argued:

"The law says, in regards to attempted murder, you don't have to be attempting to kill Sarah Donaldson because there was some vendetta against Sarah Donaldson.  The law says when you create this thing called the kill zone, if you create a zone in which you open fire on someone, you are responsible for attempted murder.  They used to call this something called transferred intent.  That is not what applies here, but that is the idea that is being represented here.  You can't just shoot up a crowd and come to court and say 'I wasn't trying to kill Sarah Donaldson, I was trying to kill a Norteno that was out there.'  You can't do that.

When this is referred to as a kill zone or zone of harm everyone within that zone of harm is a victim.  And you will hear an instruction on that when you talk about Mr. Gonzalez shooting into this crowd.  If they want to go into the theory the second shooter creates the kill zone, it doesn't matter, because he is still aiding and abetting in the sense he is part of this entire group and in his car is the shooter.  And the second car, if you want to buy into that idea, is the shooter.  But clearly, Mr. Gonzalez is the shooter.  And I said it over and over again."

Gonzalez argues the prosecutor misstated the law by telling the jury that his intent was irrelevant, and that all that was necessary was for bystanders to be within a particular spatial zone.  Prieto argues the prosecutor misstated the law because the kill zone theory is not simply another name for transferred intent, a theory that does not apply to attempted murder.  Both defendants analogize this case to People v. Anzalone (2006) 141 Cal.App.4th

25

380, a case which the court found the prosecutor's argument was erroneous and misleading.  (Id. at p. 393.)

Contrary to Gonzalez's claim, the prosecutor did not tell the jury that Gonzalez's intent was irrelevant.  Instead, he attempted to convey that the intent to kill did not have to be directed to a specific individual in the kill zone before defendant could be convicted of attempted murder.  The argument was part of the prosecutor's explanation that defendant could be convicted of attempting to murder John Doe.  If the jury believed defendant had to have intended to kill only a specific named individual, he could not have been convicted of attempting to kill an unidentified individual.

As to Prieto's argument, while the theory of transferred intent is not the same as the kill zone theory, and is not applicable to provide the requisite mental state for attempted murder, the prosecutor did not define the transferred intent theory to the jurors, and it is unlikely they were aware of the technical legal differences between the theories of transferred intent and concurrent intent. The jurors were not informed of the definition of transferred intent, thus they were not misled by the prosecutor's argument.

Finally, People v. Anzalone, supra, 141 Cal.App.4th 380, is inapplicable because the jury in this case was adequately instructed on the prosecution's theory of intent.  In Anzalone, the defendant fired two shots at group of four men.  (Id. at p. 390.)  The trial court instructed the jury that attempted murder required a specific intent to kill another human being, but gave no 'kill zone' instruction.  (Id. at pp. 390-391.)  The prosecutor argued to the jury that it could reach four counts of attempted murder even though there were only two gunshots because the law says there is something called the zone of danger.  He argued "'[a]nytime someone is within the zone of danger, whether it be one, two, three or twenty people, everything in that zone of danger qualifies.'"  (Id. at p. 391.)

The court found the problem to be that the prosecutor's argument was incomplete, and the trial court had given on instruction on the theory on which the prosecution relied.  (People v. Anzalone, supra, 141 Cal.App.4th at p. 393.)  The prosecutor had failed to explain what constituted the "zone of danger," how it related to the element of intent, that the zone is defined by the nature and scope of the attack, or that the attack must allow the reasonable inference that the defendant intended to kill the primary victim by killing everyone in that victim's vicinity.  (Ibid.)

In this case, the instruction on concurrent intent given by the trial court fully explained the theory to the jury.  There was no danger here that the jury's only understanding of the theory of concurrent intent would come from the prosecutor's argument.  The

26

1    prosecutor's reference to the kill zone theory in this case, and his
     explanation of the theory was not damaging, as it was in Anzalone,
2    because the jury was properly and fully instructed on the theory.
     Moreover, the jury was instructed that if the attorney's comments
3    conflicted with the court's instructions, it must follow the court's
     instructions.  We presume the jury understood and followed the
4    court's instructions.  (People v. Gray (2005) 37 Cal.4th 168, 231.)

5    (Slip Op. at p. 11-16.)

6    Petitioner fails to show that he is entitled to federal habeas relief on this Claim.  This

7    Claim is more easily analyzed under Strickland's prejudice prong.  Petitioner fails to show to a

8    reasonable probability that the outcome of the proceeding would have been different had his

9    counsel objected to the prosecutor's closing argument.  As described in infra Part V.G, the trial

10   court instructed the jury on the requisite intent necessary to find Petitioner guilty on the three

11   attempted murder charges.  The fact that the prosecutor mentioned transferred intent (but did not

12   define it) did not affect the outcome of the trial to a reasonable probability.  Furthermore, the jury

13   was specifically instructed that where the attorneys' comments conflicted with the court's, the

14   jury was to follow the court's instructions.  (See Reporter's Tr. at p. 1617.)  Additionally, the jury

15   was instructed that nothing that the attorneys said was to be considered evidence.  (See id. at p.

16   1619.)  The jury is deemed to have followed these instructions.  See Weeks, 528 U.S. at 234.

17   Petitioner failed to show that he was prejudiced by his counsel's failure to object.  Therefore,

18   Claim VI should be denied.

19       G.  Claim VII

20   In Claim VII, Petitioner argues that the trial court improperly instructed the jury on the

21   kill zone doctrine which diluted the prosecution's burden of proof on attempted murders and the

22   intent to kill.  The last reasoned decision on this Claim was from the California Court of Appeal

23   which stated the following:

24       Defendants argue the instruction given on the kill zone theory,
         CALCRIM 600, was erroneous because attempted murder requires
25       an intent to kill, but the instruction given referred to an intent to
         harm, not an intent to kill.  They claim their convictions for
26       attempted murder must be reversed because of the error.

27

Defendants were charged and convicted of the attempted murders of Julia Gomez, Sarah Donaldson, and John Doe. [FN 4] In People v. Bland (2002) 28 Cal.4th 313, 327, the Supreme Court explained that the mental state required for attempted murder differs from that required for murder. A conviction for murder may be had upon a finding of implied malice - conscious disregard for life, while attempted murder requires an intent to kill. (Ibid.) Likewise, a theory of transferred intent will not support a conviction for attempted murder. (Id. at p. 328.)

> [FN 4] The complaint initially charged defendants in court four with the attempted murder of Santos Bernadino. During trial, the name of the victim in count four was amended to John Doe.

However, a theory of concurrent intent, or a "kill zone" theory may still permit a person who shoots a group of people to be punished for the actions against the group. The Supreme Court, quoting Ford v. State (Md.Ct.App. 1993) 625 A.2d 984, 1000-1001, explained as follows:

> "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity . . . . [C]onsider a defendant who intends kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (Id. at pp. 329-330.) [FN 5]

[FN 5]  This was known at the common law as an "oblique intention," an intent to kill A, with the knowledge that it is "substantially certain' that B also will be killed.  (People v. Fabris (1995) 31 Cal.App.4th 685, 698, In re Stonewall F. (1989) 208 Cal.App.4th 1054, 1061, fn. 7, and authorities cited therein.)

CALCRIM No. 600 is based on the kill zone theory set forth in Bland, supra, and the jury was given the instruction as follows:

"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or kill zone.  In order to convict the defendant of the attempted murder of Sarah Donaldson, Julie Gomez, and John Doe, the People must prove that the defendant not only intended to kill Donald Monroe but also either intended to kill Sarah Donaldson, Julia Gomez, and John Doe, or intended to kill anyone within the kill zone.  If you have a reasonable doubt whether the defendant intended to kill Sarah Donaldson, Julia Gomez, or John Doe or intended to [kill] Donald Monroe by *harming* everyone in the kill zone, then you must find the defendant not guilty of attempted murder of Sarah Donaldson, Julia Gomez, and John Doe."  (Italics added.)

Defendants object to the use of the word "harming" and argue an intent to harm, as opposed to an intent to kill, is akin to implied malice, which will not support an attempted murder conviction. We rejected the same claim in People v. Bragg (2008) 161 Cal.App.4th 1385, 1395-1396.  Gonzalez argues People v. Bragg is distinguishable because the Bragg jury received supplemental instructions on the meaning of the kill zone, and because in this case the prosecutor committed misconduct by arguing to the jury that it was unnecessary to specifically intend to kill the people in the kill zone.

In reviewing the claim of error, we inquire "whether a 'reasonable juror would apply the instruction in the manner suggested by defendant.' [Citation.]"  [People v. Bragg, supra, 161 Cal.App.4th at p. 1396.)  We conclude that no reasonable juror would have construed the instruction as permitting a conviction for attempted murder premised upon an intent to harm the victims rather than an intent to kill them.  The jury here was instructed in CALCRIM No. 600 that a conviction for attempted murder of a person required the People to prove that defendant intended to kill that person.  The court also instructed that the People were required to prove that the defendant took "direct, but ineffective steps towards killing another person[,]" and that "[a] person may intend to kill a specific victim

29

or victims and at the same time intend to kill anyone in a particular zone of harm or kill zone." We determine the correctness of the jury instructions from the entirety fo the instructions, and not from consideration of parts of an instruction or from a particular instruction. (People v. Bragg, supra, at pp. 1395-1396.)

We also credit that jurors will interpret instructions with intelligence and common sense. (People v. Bragg, supra, 161 Cal.App.4th at p. 1396.) The only way that defendants could kill Monroe by "harming everyone in the kill zone" is if the harm inflicted was fatal harm, because nonlethal harm would not result in Monroe's death. If defendant's intentionally inflicted lethal harm on everyone in the zone, it reasonably follows that they necessarily intended to kill everyone in the zone.

(Slip Op. at p. 7-11.)

In California, the transferred intent doctrine does not apply to inchoate crimes such as attempted murder. See People v. Bland, 28 Cal. 4th 313, 317, 121 Cal. Rptr. 2d 546, 48 P.3d 1107 (2002). "A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill. Thus, . . . whether [a] defendant is guilty of the attempted murder of . . . surviving victims depends on his mental state as to those victims and not on his mental state as to the intended victim." Id. Therefore, for Petitioner to be guilty of attempted murder under California law the jury must have concluded, beyond a reasonable doubt, that he intended to kill Julia Gomez, Sarah Donaldson and John Doe besides Monroe, who was actually shot and killed. Petitioner's argument within Claim VII that the jury instructions lowered the burden of proof on the prosecution within the "kill zone" instruction is unavailing.

The jury was instructed that, "[i]n order to convict the defendant of attempted murder of Sarah Donaldson, Julia Gomez, and John Doe, the People must prove that defendant not only intended to kill Donald Monroe but also either *intended to kill Sarah Donaldson, Julia Gomez, and John Doe, or intended to kill anyone within the kill zone.*" (Reporter's Tr. at p. 1636-37 (emphasis added).) This instruction made clear to the jury that an intent to kill only Monroe alone was not enough to convict the Petitioner on the attempted murder of the other three. The

30

1  jury would need to conclude that Petitioner either intended to kill each of these three or intended

2  to kill everyone within the kill zone, which under the facts of this case, included Monroe,

3  Donaldson, Gomez and John Doe.  The jury was then specifically instructed that "if you have

4  reasonable doubt whether the whether the defendant intended to kill Sarah Donaldson, Julia

5  Gomez, or John Doe, or intended to call [sic] Donald Monroe by harming everyone in the kill

6  zone, then you must find the defendant not guilty of attempted murder of Sarah Donaldson, Julia

7  Gomez, and John Doe."  (Id. at p. 1637.)  Thus, the jury was specifically instructed that if they

8  had reasonable doubt whether Petitioner intended to kill Donaldson, Gomez or John Doe, they

9  must return a not guilty verdict on the attempted murder charges.  The jury is deemed to have

10  followed these instructions, see Weeks, 528 U.S. at 234, and when considering the jury

11  instructions in the context of the whole trial rather than in artificial isolation as the Court of

12  Appeal did so here, the jury instructions did not violate Petitioner's due process rights.  See

13  Estelle, 502 U.S. at 72.  Accordingly, Petitioner fails to show that the Court of Appeal's decision

14  was an objective unreasonable application of clearly established federal law and/or resulted in a

15  decision based on an unreasonable determination of the facts.  Therefore, he is not entitled to

16  federal habeas relief on Claim VII.

17     H.  Claim VIII

18     In Claim VIII, Petitioner asserts a cumulative error argument.  The last reasoned decision

19  on this Claim was from the California Court of Appeal which stated the following:

20         Prieto finally argues that the cumulative effect of the errors
        infected his trial with unfairness and deprived him of due process.
21         We found no error, either individual or cumulative, that deprived
        him of due process.

22

23  (Slip Op. at p. 47.)

24     The combined effect of multiple trial errors may give rise to a due process violation if the

25  trial was rendered fundamentally unfair, even where each error individually would not require

26  reversal.  See Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007).  The fundamental question in

determining whether the combined effect of trial errors violated a defendant's due process rights was whether the errors rendered the criminal defense "far less persuasive," see Chambers v. Mississippi, 410 U.S. 284, 294 (1973), thereby having a "substantial and injurious effect or influence" on the jury's verdict.  Cumulative error is more likely to be found prejudicial when the government's case is weak.  See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).

As described supra, many of the purported "errors" Petitioner asserts in his federal habeas petition were not in fact errors at all.  Additionally, this was not necessarily a weak case against Petitioner.  By way of example only, Petitioner was in the vehicle that committed the drive-by shooting and one of the few outstanding issues at trial was Petitioner's knowledge which would give rise to Petitioner as an aider and abettor.  Thus, Petitioner is not entitled to federal habeas relief on his cumulative argument.

## VI.  PETITIONER'S REQUESTS

### A.  Appoint Counsel

Petitioner requests the appointment of counsel.  There currently exists no absolute right to the appointment of counsel in habeas proceedings.  See, e.g., Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require."  In the present case, the interest of justice does not so require the appointment of counsel.  Accordingly, Petitioner's request for the appointment of counsel is denied.

### B.  Evidentiary Hearing

Petitioner also requests an evidentiary hearing on his Claims.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v. Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief."  Earp, 431 F.3d at 1167 (citations omitted).

1   To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if

2   true, would entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (internal

3   quotation marks and citation omitted).  In this case, an evidentiary hearing is not warranted for

4   the reasons stated in supra Part V.  Petitioner failed to demonstrate that he has a colorable claim

5   for federal habeas relief.  Moreover, the Supreme Court has recently held that federal habeas

6   review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that

7   adjudicated the claim on the merits" and "that evidence introduced in federal court has no

8   bearing on" such review.  Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his

9   request will be denied.

VII.  CONCLUSION

10

11      Accordingly, IT IS HEREBY ORDERED that:

12      1.      Petitioner's request for the appointment of counsel is DENIED; and

13      2.      Petitioner's request for an evidentiary hearing is DENIED.

14      For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

15   habeas corpus be DENIED.

16      These findings and recommendations are submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties.  Such a document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

21   shall be served and filed within seven days after service of the objections.  The parties are

22   advised that failure to file objections within the specified time may waive the right to appeal the

23   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

24   elects to file, Petitioner may address whether a certificate of appealability should issue in the

25   event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

26   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

1  when it enters a final order adverse to the applicant).

2  DATED:  November 21, 2011

3

4  _____

5  TIMOTHY J BOMMER
   UNITED STATES MAGISTRATE JUDGE